[No. D027299. Fourth Dist., Div. One. Feb. 3, 1998.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES LEE BELL, Defendant and Appellant.

**COUNSEL**

Patrick Morgan Ford, under appointment of the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Craig S. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HUFFMAN, J.**—A jury convicted Charles Lee Bell of one count of robbery (Pen. Code,[1] § 211) and one count of attempted robbery (§§ 664/211/213, subd. (b)). In a bifurcated proceeding, Bell waived his right to a jury trial and the court found true allegations he served one prior prison term (§ 667.5, subd. (b)), had been convicted of a prior serious felony (§ 667, subd. (a)(1)), and had suffered two prior convictions for serious or violent felonies (§ 667, subds. (b)-(i)).[2]

The court sentenced Bell to a total term of 55 years to life. The court imposed two consecutive terms of twenty-five years to life for the robbery and attempted robbery offenses. The court imposed an additional consecutive five-year term for his prior serious felony conviction. The court stayed sentencing on the prison prior.

Bell appeals, contending: (1) the court erred by discharging the only African-American male juror because he required a break to take his child to the doctor, (2) the court erred by refusing to exclude an in-court identification by a witness or at least suspend proceedings for further investigation due to the prosecutor's failure to provide full and timely discovery regarding the witness, and (3) his sentence is invalid because the court misunderstood its discretion to impose concurrent sentences for current felonies committed simultaneously. We find merit only in Bell's claim that his sentence is invalid.

## FACTS

On February 18, 1996, Kako Lee and Karen Lundeen were walking down Fourth Avenue in San Diego after having dinner in the Gaslamp Quarter. Lee heard footsteps coming quickly from behind them. She turned and saw Bell and another person approaching, but she turned back around because she thought they were simply trying to pass them. She felt someone pulling on her purse and, before she could turn around, Bell punched her in the face. Bell told her to let go of her purse, but she resisted. While Bell and Lee were

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

[2]Section 667, subdivisions (b) through (i) was enacted as emergency legislation on March 7, 1994. (Stats. 1994, ch. 12.) Section 1170.12 was enacted November 9, 1994, after the voters approved Proposition 184. (Cal. Const., art. II, § 10, subd. (a).) The two enactments commonly referred to as the three strikes law contain almost identical provisions. Because Bell was charged with crimes occurring after section 1170.12 was added to the Penal Code, that section rather than section 667, subdivisions (b) through (i) technically controls the case. However, because many of the cases discussing the provisions of the three strikes law refer to section 667, subdivisions (b) through (i), our discussion of the three strikes law will generally refer to that section.

struggling for the purse, Lee kicked him in the groin. Bell fell to the ground, and Lee went to the middle of the street to yell for help.

As Bell was attempting to take Lee's purse, Erika Scott grabbed Lundeen from behind by the hair and pulled hard. They struggled. Scott pushed Lundeen backward, causing her to fall and hit her head on the curb. Lundeen put her leg up, with her foot in Scott's chest, to fend off the attack. Scott tried to punch and scratch Lundeen and demanded Lundeen's money, but Lundeen continued to repel the attack. Scott grabbed Lundeen's shirt in an attempt to draw her closer, tearing the shirt. Scott continued to try to punch Lundeen.

About this time, Lee noticed Lundeen's predicament and came to her aid. Lee swung and hit Scott with her purse, breaking the strap. The bag fell away from Lee. Scott cursed and got up. By this time, Bell had recovered somewhat from the kick and he grabbed the purse. Bell and Scott ran away. Lee and Lundeen went to a nearby hotel and called the police.

Approximately 2:30 a.m. on February 19, William Robinson was conducting his rounds as a security guard at a bank. Robinson noticed a Black male and a White female walking near a park just outside the bank. He continued on his rounds and found Lee's purse and some of its contents scattered in and around a trash can in the park. Robinson was 80 percent certain that Bell was the Black male he had seen leaving the park that night.

Approximately 7 a.m., San Diego Police Officer Bradley O'Donnell contacted Bell and Scott. Bell was placed in a police car on the driver's side while O'Donnell talked with Scott. O'Donnell subsequently arrested Bell and Scott. He searched and handcuffed them, placed them in the police car, and transported them to the police station. When Bell and Scott were removed from the police car, the officer found a credit card, two bank cards and a phone card, all with Lee's name on them, hidden underneath the seat on the driver's side of the vehicle.

DISCUSSION

I

*Dismissal of Juror No. 2*

Bell contends the trial court erred when it discharged juror No. 2, the only African-American male on the panel, during trial because juror No. 2 needed a break to take his son to the doctor. We disagree.

Section 1089, in relevant part, states: "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes

ill, or upon other good cause shown to the court is found unable to perform his duty, or if a juror requests a discharge and good cause appears therefor, the court may order him to be discharged . . . ." The decision to discharge a juror rests within the sound discretion of the trial court. (*People* v. *Turner* (1994) 8 Cal.4th 137, 205 [32 Cal.Rptr.2d 762, 878 P.2d 521].) The court must make a reasonable inquiry to determine whether the person in question is able to perform the duties of a juror. (*People* v. *Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251].) If the answer is in the negative, the inability to perform those duties must be shown on the record to be a "demonstrable reality." (*People* v. *Holt* (1997) 15 Cal.4th 619, 659 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

While the court's decision will be given great deference, its discretion is not unfettered. (*People* v. *Roberts* (1992) 2 Cal.4th 271, 325 [6 Cal.Rptr.2d 276, 826 P.2d 274].) We review for abuse of discretion. (*People* v. *Beeler* (1995) 9 Cal.4th 953, 989 [39 Cal.Rptr.2d 607, 891 P.2d 153].) An abuse of discretion occurs where the court's decision exceeds the bounds of law or reason. (*Mallett* v. *Superior Court* (1992) 6 Cal.App.4th 1853, 1874 [8 Cal.Rptr.2d 829].) However, it is important to note while many courts have considered the matter, few have disturbed a trial court's decision to discharge a juror for good cause. (*People* v. *Halsey* (1993) 12 Cal.App.4th 885, 892 [16 Cal.Rptr.2d 47].)

Here, jury trial began on Friday, July 12, 1996. On that day both counsel presented opening statements and the People called four witness to testify. Court was recessed for the weekend. On Monday morning, juror No. 2 called the court and spoke to the court clerk. He stated his son had an emergency and he needed to take him to the doctor. He was somewhat vague and did not indicate the nature of the emergency. Juror No. 2 stated he was a member of a health maintenance organization (HMO) and he had not determined what preliminary steps were necessary to get his son to a doctor. He believed he could be back by 1:30 p.m., but did not anticipate being able to arrive any sooner. At the court's request, juror No. 2 agreed to call back at 10:30 a.m. to update his situation.

The court held a short conference, with Bell and both counsel present, to determine whether they should wait for juror No. 2 or discharge him and replace him with an alternate juror. Bell suggested the court wait for juror No. 2 or at least to wait for his 10:30 a.m. call before determining whether to discharge him. Bell noted this was a three strikes case with a possible exposure of 81 years to life. He further stated juror No. 2 was an exemplary juror and was the only African-American male on the panel. The only other African-American on the panel was a woman. Bell argued racial balance was important in his jury selection decisions and discharging the only Black male

juror would upset this balance. Bell suggested the court let the jury go for the morning and use the time to go over jury instructions and perhaps have the bench trial on the priors.

The prosecutor noted juror No. 2 was trying to care for a sick child and work his way through the "labyrinth" of the HMO system. He also expressed concern regarding whether juror No. 2 would be able to return in the afternoon given the nature of the emergency. The prosecutor stated both judicial economy and simple courtesy supported going forward. There were six witnesses scheduled to testify and he anticipated finishing the evidence and perhaps beginning argument that day. In addition, he argued juror No. 2 should be given the same consideration as any other juror who has a family emergency and he should not be pressured to return to jury service.

The court considered Bell's arguments and noted juror No. 2 was an excellent juror. However, the court stated the juror did not know exactly when he could return. The court further observed the trial was almost over and the other jurors, alternates, and witnesses were being kept waiting. Under the circumstances presented, the court decided to discharge juror No. 2, replace him with an alternate juror, and move forward with the trial in the interest of judicial economy.

It is apparent from the record the court and both parties held juror No. 2 in high esteem. Losing such a juror is certainly unfortunate. ▮ However, under the circumstances, it was not an abuse of discretion to discharge him from the panel.

The court made a reasonable inquiry into good cause through its phone contact with juror No. 2 and the conference with the parties. The court found juror No. 2 needed to take his son to the doctor and, although he believed he could be back by 1:30 p.m., he was unable to make any firm commitments regarding when he would return. In addition, from the facts presented, the court made a reasonable and permissible inference juror No. 2 might not be able to return at all that day. In the meantime, the other 11 jurors and 2 alternates were waiting for court to convene. In addition, at least five of the People's six scheduled witnesses were waiting to testify. Thus, the court made an adequate inquiry and no further investigation was required.

In his briefs, Bell makes much of what, in his opinion, the court could or should have done. And, in fact, the court could (or perhaps even should) have waited until juror No. 2 checked back with the court at 10:30 a.m. However, these arguments completely overlook the applicable standard of review. We will not second-guess the trial court's discretionary decisions. We review only for an abuse of discretion. "The exercise of that discretion is not rendered abusive merely because other alternative courses of action may

have been available to the trial judge." (*People* v. *Hall* (1979) 95 Cal.App.3d 299, 307 [157 Cal.Rptr. 107].) After a review of the record, we cannot conclude the court abused its discretion.

As discussed above, the court conducted an adequate inquiry into good cause, and caring for a sick or injured family member surely constitutes good cause. (*People* v. *Hall, supra,* 95 Cal.App.3d at p. 307.) Furthermore, given the uncertain timing of his return and the fact so many jurors, alternates, and witnesses were waiting, the court was well within its discretion to discharge juror No. 2 and replace him with an alternate juror.

While we recognize the importance of jury selection and we understand Bell's disappointment with losing juror No. 2, Bell cannot reasonably expect the court system to be placed in "park" in the hope that an ostensibly favorable juror will return at some future time.

In his opening brief, Bell also discusses at length the importance of the court's decision to discharge the only Black male on the jury. In support of his argument he cites *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] and *Batson* v. *Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69]. To the extent Bell is attempting to raise a challenge under either the federal or state Constitution, any alleged error is waived. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 987, fn. 16 [2 Cal.Rptr.2d 112, 820 P.2d 214] [holding a criminal defendant waived the right to object to the trial court's discharge of a juror on federal constitutional grounds due to his failure to state his objection on those grounds at trial].)

In any event, even if we considered the claim properly raised and preserved for appeal, it fails for lack of merit. Under both the Sixth Amendment to the United States Constitution and article I, section 16 of the California Constitution, a criminal defendant has a right to a fair and impartial jury "drawn from 'a representative cross-section of the community.'" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 266, fn. omitted.) However, the defendant is not entitled to have a jury with the racial composition of his choice. (*People* v. *Williams* (1997) 16 Cal.4th 635, 663 [66 Cal.Rptr.2d 573, 941 P.2d 752].) Excluding venirepersons from being on a jury, or discharging a sitting juror, on the sole basis of race would contravene these constitutional guarantees. However, discharging a Black person from jury service upon a finding of good cause, due to a family illness or injury, plainly does not. Accordingly, the claim of error is rejected.

## II

### *In-court Identification*

Bell contends the trial court committed reversible error by permitting Robinson to identify Bell at trial as the man he saw leaving the park just

prior to Robinson's finding Lee's purse in the park. Bell claims the prosecutor committed clear violations of the discovery rules and denied him due process of law. Thus, he asserts the court erred by failing to exclude the witness's testimony. At a minimum, Bell argues the court should have suspended the proceedings for the day in order to give defense counsel time to prepare for cross-examination. We will reject the claim of error.

Here, the People called William Robinson in its case-in-chief to testify about finding Lee's purse. Due to an oversight, the prosecution did not provide discovery regarding Robinson's potential testimony until July 9, three days prior to trial. Defense counsel did not object to the late discovery because he believed Robinson's testimony would be favorable to the defense.

Prior to trial, Robinson had been unable to identify either Bell or Scott from photographic lineups and the prosecution had no reason to believe Robinson would be able to identify Bell during trial. Thus, the prosecutor did not intend to have Robinson attempt to identify Bell from the stand.

On July 15, the second day of trial, Robinson came face-to-face with Bell. At that time, Robinson indicated for the first time that he could positively identify Bell as the person he saw leaving the park on the night of the attack. The prosecutor immediately informed defense counsel of the development.

Bell requested Robinson's testimony be excluded on the bases of discovery violations and Evidence Code section 352 (due to the late discovery). In the alternative, defense counsel requested that the court suspend proceedings for the day to enable him to prepare for cross-examination.

The court held a hearing pursuant to Evidence Code section 402 to determine the admissibility of Robinson's testimony. Robinson testified at the hearing and was subject to thorough cross-examination. Following argument of both counsel, the court determined the testimony would be admitted and there was not sufficient cause to delay proceeding. The court stated that following his testimony, Robinson would be subject to recall in case the defense unearthed any new information prior to the end of trial.

Defense counsel moved to dismiss on the grounds of prosecutorial misconduct. The court determined there was absolutely no evidence of bad faith on the part of the prosecutor and summarily denied the motion.

Following the Evidence Code section 402 hearing, but before Robinson testified at trial, defense counsel had the opportunity to talk to him. Defense counsel discovered Robinson had a misdemeanor conviction for welfare fraud.

In his reply brief, Bell states: "The pertinent question is not, as respondent suggests, whether the trial court erred in finding there was no discovery violation. . . . There was clearly a discovery violation." Other than the apparently late disclosure of Robinson as a witness, we do not see the blatant violation alleged by Bell. Furthermore, any objection to the admission of Robinson's testimony on the grounds the prosecutor failed to disclose his identity until July 9 was certainly waived when Bell proceeded to trial without objection.

While we prohibit trial by ambush, surprises may still sometimes happen at trial. Here, there is no evidence in the record from which we could reasonably infer the prosecutor knew Robinson would be able to identify Bell at trial. Thus, there is nothing patently erroneous about the court's ruling. However, we need not and will not address the merits of Bell's claim because there is no possible prejudice arising from any alleged error.

■ A trial court's erroneous ruling is not grounds for reversal unless the defendant suffers actual prejudice therefrom. (Cal. Const., art. VI, § 13; *People* v. *Reber* (1986) 177 Cal.App.3d 523, 532 [223 Cal.Rptr. 139], disapproved on other grounds in *People* v. *Hammon* (1997) 15 Cal.4th 1117, 1123 [65 Cal.Rptr.2d 1, 938 P.2d 986].) Prejudicial error must be affirmatively demonstrated and will not be presumed. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The test for prejudice is whether a different result is reasonably probable absent the error.[3] (*People* v. *Watson, supra,* 46 Cal.2d at p. 836.) ■ Here, even assuming the court erred by admitting the testimony, or failing to provide a delay in the proceedings, there is no possibility Bell was prejudiced by the alleged error.

Bell was given a full opportunity to confront and cross-examine the witness about the reliability of his identification prior to trial, in the Evidence Code section 402 hearing, and at trial. At trial, defense counsel effectively undermined Robinson's identification testimony on the basis of his vague memory and his inability to make a prior identification in the photographic lineup. In addition, defense counsel thoroughly impeached Robinson by disclosing the conduct underlying his welfare fraud conviction.

Moreover, the other evidence of Bell's guilt was overwhelming. Robinson's testimony was not "key" to the identification of Bell as the perpetrator,

---

[3]We apply the general harmless error standard of review. We do not apply the more rigorous "harmless beyond a reasonable doubt" standard, as described in *Chapman* v. *California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065], because Bell's constitutional right to due process was not implicated by the alleged error. As we will discuss more thoroughly below, Bell was given a full opportunity to confront and cross-examine Robinson, and defense counsel did so effectively. As such, the standard of review for constitutional error is not implicated, and we apply the general standard of review as set forth in *People* v. *Watson, supra,* 46 Cal.2d 818.

as Bell suggests. At trial, Lee positively identified Bell as her attacker. In addition, Officer O'Donnell's testimony regarding finding the credit and automatic teller machine cards in his patrol car following Bell's arrest was highly incriminating. In contrast, the value of Robinson's identification of Bell was questionable due to defense counsel's powerful cross-examination.

Bell has presented insufficient evidence to support a claim of prejudice. Therefore, the claim of error is rejected.

## III

### Unauthorized Sentence

■ Bell contends the trial court erred by finding consecutive sentences were mandatory under the three strikes law. Bell claims section 667, subdivision (c)(6) and (7), by implication, give the court discretion to sentence a defendant to concurrent terms for felonies committed simultaneously.[4] Following submission of appellant's opening brief, the California Supreme Court decided *People* v. *Hendrix* (1997) 16 Cal.4th 508 [66 Cal.Rptr.2d 431, 941 P.2d 64]. In *Hendrix*, the California Supreme Court held that under the three strikes law a sentencing court retains the power to impose concurrent terms for current serious or violent felonies committed on the same occasion. (*Id.* at p. 513.)

The Attorney General does not argue *Hendrix* was wrongly decided, but instead contends the case is inapplicable here. The Attorney General states section 667, subdivision (e)(2)(B),[5] controls and requires consecutive sentences because here the current offenses were not committed on the same occasion. The Attorney General claims *Hendrix* is inapplicable because that opinion was premised upon a stipulation the crimes occurred on the same occasion. The Attorney General contends a section 654 analysis should apply to determine whether these crimes were committed on the same

---

[4]Section 667, subdivision (c), in relevant part, provides: "Notwithstanding any other law, if a defendant has been convicted of a felony and it has been pled and proved that the defendant has one or more prior felony convictions as defined in subdivision (d), the court shall adhere to each of the following: [¶] . . . [¶] (6) If there is a current conviction for more than one felony count not committed on the same occasion, and not arising from the same set of operative facts, the court shall sentence the defendant consecutively on each count pursuant to subdivision (e). [¶] (7) If there is a current conviction for more than one serious or violent felony as described in paragraph (6), the court shall impose the sentence for each conviction consecutive to the sentence for any other conviction for which the defendant may be consecutively sentenced in the manner prescribed by law."

[5]Section 667, subdivision (e), in relevant part, states: "For purposes of subdivisions (b) through (i), inclusive, and in addition to any other enhancement or punishment provisions which may apply, the following shall apply where a defendant has a prior felony conviction: [¶] . . . [¶] [2] (B) The indeterminate term . . . shall be served consecutive to any other term of imprisonment for which a consecutive term may be imposed by law."

occasion. Applying a section 654 analysis, the Attorney General claims the robberies here did not arise from the same set of operative facts and were not committed on the same occasion because the crimes were committed against two separate victims.

In *Hendrix,* the defendant pointed a gun at four people and demanded their money. (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 510.) Two of the victims complied, and he left. (*Ibid.*) A jury convicted the defendant of two counts of robbery and two counts of attempted robbery. (*Ibid.*) The defendant admitted he suffered three prior strike convictions. (*Id.* at p. 511.) At sentencing, the trial court sentenced him to four consecutive terms of twenty-five years to life. (*Ibid.*)

On appeal, the Supreme Court was faced with a pure question of law, whether under the three strikes law a court had the discretion to sentence a defendant to concurrent terms for multiple current serious or violent felonies committed on the same occasion. (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 511.) The parties stipulated the current crimes were in fact committed on the same occasion. (*Id.* at p. 514.) The Supreme Court held the sentencing court did have the discretion to impose concurrent terms. (*Id.* at p. 513.)

We recognize the *Hendrix* decision arose in the context of a stipulation. However, the Supreme Court's language in the majority opinion in that case indicates the court would, in any event, have concluded the robberies occurred on the same occasion.

Support for the Attorney General's argument may be found in a concurring opinion in *Hendrix.* In his concurring opinion, Chief Justice George expressly limits his agreement to the facts presented. He states: "The parties in the present case have not briefed or argued this issue and, instead, have conceded that the present offenses were committed on the same occasion within the meaning of [section 667, ]subdivision (c)(6). I accept this concession but, in doing so, I express no opinion regarding the proper interpretation of the phrase 'not committed on the same occasion, and not arising from the same set of operative facts.' " (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 516 (conc. opn. of George, C. J.).) Thus, from the language of this concurring opinion, it appears the holding of *Hendrix* might not apply in the absence of a prior finding or concession the current convictions arose from the same set of operative facts or occurred on the same occasion. The opinion leaves open the possibility that a section 654 analysis could apply absent such a finding or stipulation.

However, in contrast, the majority opinion suggests the court made an implied finding the robberies in that case did in fact occur on the same occasion. Justice Brown spoke for the majority of the court and framed the issue presented as follows: "The issue before us is whether consecutive

sentences are mandatory under [section 667,] subdivision (c)(6), (c)(7), or subdivision (e)(2)(B), when the defendant has two or more prior felony convictions within the meaning of [section 667,] subdivision (d), and commits serious or violent felonies against multiple victims *at the same time.*" (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 511, fn. omitted, italics added.) From this language, it appears the majority is taking the position that where a defendant commits multiple current crimes simultaneously, they necessarily arise from the same set of operative facts or are committed on the same occasion for the purposes of this action.

In addition, the majority stated: "Here, as the parties concede, all of the current serious and violent felony convictions were 'committed on the same occasion.'" (*People* v. *Hendrix, supra,* 16 Cal.4th at p. 514.) Thus, while the court acknowledges and accepts the stipulation of the parties, in context the language appears to support the conclusion that the majority made an independent finding the robberies did in fact occur on the same occasion. The majority gave no indication it intended the opinion to be limited in the manner suggested by the Chief Justice.

We conclude *Hendrix* is binding authority for the proposition that where a defendant simultaneously commits several serious or violent felonies, the felonies will be considered to have occurred on the same occasion. Accordingly, *Hendrix* is dispositive unless the case is factually distinguishable.

We see no reasoned basis on which the facts presented here may be distinguished from the facts in *Hendrix.* The only significant difference is that under our facts, the robbery and attempted robbery were simultaneously perpetrated by two attackers acting in concert, instead of just one perpetrator acting alone. We do not consider such a minor factual variation a sufficient basis to deviate from the most recent mandate of our Supreme Court.

We consider *Hendrix* to be dispositive of the issue presented and therefore hold the trial court erred by finding it did not have the discretion to sentence the defendant to concurrent terms. Accordingly, we remand the matter for resentencing so the court may exercise its discretion.

## CONCLUSION

The sentence is vacated and the matter remanded for resentencing in accordance with the views expressed in this opinion. In all other respects, the judgment is affirmed.

Kremer, P. J., and Nares, J., concurred.