Filed 2/26/13  P. v. Bailey CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHARLES BAILEY,<br><br>    Defendant and Appellant. | B241079<br><br>(Los Angeles County<br>Super. Ct. No. BA390045) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed.

David H. Goodwin, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and Ana R. Duarte, Deputy Attorneys General, for Plaintiff and Respondent.

_____

# INTRODUCTION

A convicted sex offender is required to register in his county of residence. A convicted sex offender who has no place to live is required to register in the county in which he is a transient. If the transient sex offender thereafter acquires a residence, he must register anew within five working days. (Pen. Code,[1] §§ 290, 290.011, subd. (b); *People v. Aragon* (2012) 207 Cal.App.4th 504, 506.)

Defendant Charles Bailey, who previously was convicted of a crime requiring him to register as a sex offender pursuant to section 290, appeals from the judgment entered after a jury found him guilty of three counts of being a transient convicted sex offender who failed to register after moving to a residence (§ 290.011, subd. (b)) and three counts of failing to register as a sex offender after an address change (§ 290, subd. (b)), and he admitted that he suffered a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12) and served two prior prison terms (§ 667.5, subd. (b)). The trial court sentenced him to state prison for a total of six years.

Defendant's sole contention on appeal is that the trial court erroneously allowed the People to present testimony as to efforts made to locate two witnesses who did not testify at trial. Defendant claims this evidence was irrelevant and permitted the jury to draw speculative inferences based on innuendo. While we agree that the challenged testimony was irrelevant and thus inadmissible, defendant has failed to demonstrate that he was prejudiced as a result of the court's evidentiary error. Consequently, we affirm the judgment.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

## FACTS

Delmas Davis (Davis) owned a triplex comprised of 10007, 10009 and 10009½ South Hobart Boulevard in Los Angeles. He maintained the property, rented the units and collected the rent. Davis did not live on the property, but he did live nearby.

Jakeira Green (Jakeira) rented the rear unit commonly known as 10009 Hobart Boulevard, and her sister, Jamila Green (Jamila), rented the upstairs unit. Carol Ross (Ross) rented the front unit.

Davis was a school teacher. In July and August 2011, while on vacation from teaching, Davis went to the property four or five times a month. In September, he returned to teaching and visited his property less often.

While at the property, Davis often saw his tenants. Davis had seen defendant at the triplex five to ten times before July 2011 and continued to see him through September 1, 2011. On one occasion, after seeing him numerous times, Davis asked defendant if he lived there. Defendant said he did not. Davis believed this conversation took place in December 2010. Davis knew that only Jakeira and her two children, not defendant, were listed as tenants in the rental agreement.

On another occasion in February or March 2011, Davis observed defendant leave Jakeira's unit, go to a dark green car in a robe and then return to the unit. On more than five other occasions, Davis had seen defendant drive the green car. Davis also regularly saw the green car parked near the triplex, perhaps 10 to 20 times. As of July 2011, Davis believed defendant was living with Jakeira despite his prior assertion to the contrary. On numerous occasions during the summer months, Davis saw defendant with Jakeira and her children, leaving the unit and then returning. Davis also observed defendant coming and going by himself or with Jakeira's two children and returning to the apartment.

On one occasion, Jakeira introduced defendant to Davis as her boyfriend. On another occasion, maybe a month later, she introduced defendant to Davis as her fiancé.

Ross could not recall the precise year she moved into her unit, but she did recall that Jakeira and her two children moved into the rear unit about two months later. Ross

3

first saw defendant at the property in March 2011. As time went on, Ross saw defendant more frequently. In July 2011, Ross, who was retired and described herself as a "homebody,"[2] saw defendant everyday and believed he lived with Jakeira. Ross observed defendant leave in the morning with Jakeira and her two children, as well as his baby, and return 20 minutes later with the baby and enter Jakeira's unit. In the afternoon, defendant left with the baby and returned 20 minutes later with Jakeira and her children. According to Ross, defendant drove Jakeira's white car, in that he no longer had his green car. Ross also saw him every day in August and September 2011, and she believed that defendant lived with Jakeira during the months of July, August and September 2011.[3]

Ross observed defendant enter Jakeira's unit. Most of the time, defendant stayed inside. Once or twice, Ross saw defendant wash the car in front of the building.

On July 28, 2011, Los Angeles Police Officer Fernando Cazarez was assigned to the Registration Enforcement and Compliance Team (REACT) at Central Division. REACT monitors and registers sex offenders, as well as conducts compliance checks. Defendant came into the station and informed Officer Cazarez that he was changing his registration from one transient location to another transient location at 49th Street and Broadway Avenue. The officer took note that defendant was very well groomed and his clothes seemed neatly presented. In Officer Cazarez's view, defendant's appearance was inconsistent with that of a person who was homeless.

_____

[2] When Ross was questioned as to whether she saw everything, she responded, "I see enough to know the pattern of the neighborhood and to make me aware of my surroundings." When asked about Jakeira's visitors, Ross testified "they made a lot of noise" and that was one of the reasons she "paid attention to what was going on, because sometimes it was boisterous."

[3] In December 2011, Ross told a defense investigator she was not sure that defendant lived there. She also noted that she was not going to change her mind about what she said to the police.

4

Officer Cazarez advised defendant that if he was sleeping at a residence or if he was staying with his girlfriend or anyone else, he had to provide that information. If he failed to do so and the police found out he was staying with someone, he would be arrested. Defendant appeared to understand the requirements and asked no questions.

On August 23, 2011, Officer Mehra Newby, who was assigned to REACT, processed defendant's sex offender registration. Defendant, who appeared to understand the registration requirements, stated he was homeless and did not provide information about another address.

On September 27, 2011, REACT Officer Lauro Larrinua registered defendant as a sex offender. Defendant again registered as a transient in the area of 49th Street and Broadway Avenue and gave no other address. Officer Larrinua explained to defendant the requirements that go along with being a convicted sex offender.

On October 17, 2011, Los Angeles Police Detective Michael Falvo, along with other officers, went to 10009 South Hobart Boulevard, where they believed defendant was living. Detective Falvo drove to the alley behind the location and waited while two officers knocked on the door.

While standing in the alley behind a steel gate door, Detective Falvo saw defendant walk up to the gate from the side of the yard. He was wearing boxer shorts and a T-shirt and was smoking a cigarette. The detective identified himself as a police officer, told defendant that he recognized him from photographs and wanted him to stop so he could talk to him. Defendant said, "I don't live here" and walked into the yard. Fearing defendant would get away, Detective Falvo jumped over the fence, pursued him through the backyard and stopped defendant as he was attempting to climb over a wall.

At the time of defendant's arrest, Jakeira was present. Detective Falvo attempted to interview Jakeira, but she was uncooperative and very upset that defendant had been arrested. Inside Jakeira's apartment, Detective Falvo saw "some male clothing and things." He did not remember if he found any men's shoes. He did not look for any documents bearing defendant's name or mail sent to defendant at the Hobart Boulevard address. Detective Falvo did not go into the bedroom to see if there were any male items

5

and did not know if defendant had a key to the apartment. He did enter the bathroom but could not recall if he saw any male toiletries. The detective did not know who paid the rent or purchased the food or whose name was on the utility bills.

At the end of March 2012, Detective Falvo received a subpoena for Jakeira. He went to her residence on numerous occasions but Jakeira was never there.

On March 29, 2012, Lawrence Arnwine (Arnwine), an investigator for the District Attorney's Office, received a subpoena with Jamila's name and date of birth and obtained her address via public records. After checking various other search engines, Arnwine went to Jamila's residence. Arnwine verified Jamila's identity, talked to her about this case, and personally served her with the subpoena directing her to appear in court on April 3.

On April 3, the prosecutor obtained a body attachment for Jamila, who failed to appear. That same day, Arnwine returned to Jamila's residence in an effort to ensure her appearance in court. He was unable to find her at home or in the area.[4] The following day, Arnwine repeated his efforts without success.

## DISCUSSION

### A. *Pertinent Background*

Defendant unsuccessfully objected on relevancy grounds to the testimony of Detective Falvo regarding his efforts to subpoena Jakeira and to the testimony of Investigator Arnwine regarding his efforts to locate Jamila after she failed to appear in court as directed by the subpoena with which she was served. Defense counsel argued, among other things, that this testimony would insinuate that the testimony of the sisters would be favorable to the People. The trial court noted that, in Jakeira's and Jamila's absence, the defense was at liberty to argue that the jury never heard from the two people

---

[4] On April 3, Ross testified that Jamila no longer lived in the upstairs unit.

in the best position to say whether defendant was living there, and thus "it's fair to permit the People to say, we tried to subpoena them, they were unavailable." In the court's view, the absence of Jakeira and Jamila foreclosed any argument that they might have said something favorable to defendant. Defense counsel was unable to cite any legal authority suggesting that it would be improper to admit the detective's and the investigator's challenged testimony.

In her closing argument to the jury, defense counsel referenced the prosecution's efforts to secure the presence of Jakeira and Jamila, stating: "Now, you did not hear from Jamila Green or Jakeira Green, and the People put on evidence that they somehow attempted to bring these people in and were unable to. The fact that they tried to get these witnesses in and didn't does not lower their burden of proof in this case. It's irrelevant that they aren't here. And frankly, . . . you don't know what they would say. For all you know, they would have said that Mr. Bailey did in fact not live there. So you cannot consider that. You must go back in the jury deliberation room and look at what you have in front of you and decide, did they prove this case. And the fact that they didn't — tried to get witnesses and weren't able to does not give you credence to then gloss over that and then — and assume that what they said would have helped them prove this case."

In her final summation, the prosecutor responded to defense counsel's argument as follows: "We can speculate all we want about Jakeira Green and Jamila Green. You didn't hear from them, obviously. We know that Jakeira Green, from the evidence, was upset when the defendant was arrested. And she wasn't here despite the efforts of my office and the law enforcement agency to find her. And the same goes for Jamila Green. You might wonder and — you're not to speculate, because that's not evidence, but what I will tell you is that the defense doesn't have to call a single witness. They don't have the burden of proof. But if they want to, they have the power to subpoena anybody they want, if they want to. They don't have to. They don't have to do anything."

After the trial court overruled an objection made by defendant, the prosecutor continued: "Yes. The defense, as I was saying, has no burden of proof, but they are

entitled and they do have the power to subpoena witnesses on their own behalf, logically, witnesses that they would want to call. They don't have to, but they can. That's neither here nor there, in a way, because neither side — you heard from the People's witnesses that attempts were made to find these two witnesses, and those attempts were unsuccessful. But you actually got to hear from witnesses who were completely unrelated to the defendant and that's better, in a way, than hearing from people who are — like Jakeira Green dating the defendant, right, or people who are related to the defendant's girlfriend, people with a potential bias or motive. You heard from completely independent neutral witnesses with no motive to lie, with no reason to come in here and tell you anything but the reality of their observations."

## B. *Relevancy*

To be admissible, evidence must be relevant. (Evid. Code, § 350; *People v. Tully* (2012) 54 Cal.4th 952, 1010; *People v. Lewis* (2001) 25 Cal.4th 610, 639-640.) "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.)

Evidence that is proffered to prove or disprove a disputed fact in an action is relevant if "[t]he disputed fact is either an intermediate or ultimate fact that is of consequence to determination of the action" and "[t]he evidence, in the light of logic, reason, experience, or common sense, has, by reasonable inference, a tendency to prove or disprove the disputed fact." (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2009) Relevancy and General Principles of Evidence, § 21.16, p. 354; accord, *People v. Hill* (1992) 3 Cal.4th 959, 987-988, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

"The court must exclude irrelevant proffered evidence which has a tendency to prove or disprove a disputed fact only if the trier of fact must draw speculative or conjectural inferences from it. [Citation.]" (*People v. Parrison* (1982) 137 Cal.App.3d 529, 539; 1 Jefferson, Cal. Evidence Benchbook, *supra*, Relevancy and General

8

Principles of Evidence, § 21.17, p. 354 ["Proffered evidence is not relevant if it has a tendency to prove or disprove a disputed intermediate or ultimate fact of consequence to determination of the action only by resort to inferences or deductions from that evidence that are speculative or conjectural in nature."].)

The trial court has wide discretion in determining whether evidence is relevant. (*People v. Booker* (2011) 51 Cal.4th 141, 187; *People v. Lomax* (2010) 49 Cal.4th 530, 581.) The trial court has no discretion to admit irrelevant evidence. (*People v. Blacksher* (2011) 52 Cal.4th 769, 819.)

## C. *Analysis*

On appeal, we review the trial court's decision to admit evidence under the abuse of discretion standard. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) An abuse of discretion occurs when the trial court's ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

In this case, the disputed material fact was whether defendant was residing with Jakeira in July, August and September 2011, the months during which he registered solely as a transient sex offender. Defendant contends that "[a] witness provides relevant evidence through his or her testimony" and that "[t]he fact that a witness testified or how the witness got to court is not relevant." Defendant further observes that "[a] witness not testifying does not provide relevant information." We agree in this case.

Evidence of the efforts made to secure Jakeira's and Jamila's appearance at trial had no tendency in reason to prove or disprove whether defendant resided with Jakeira, and had the potential of allowing the jurors to speculate as to why the two sisters did not appear in court. Because this evidence was irrelevant, the trial court abused its discretion in admitting it. (*People v. Blacksher*, *supra*, 52 Cal.4th at p. 819; *People v. Parrison*, *supra*, 137 Cal.App.3d at p. 539.)

Prejudice is not presumed, however. It must be affirmatively demonstrated (*People v. Bell* (1998) 61 Cal.App.4th 282, 291), and defendant has failed to make the required showing. Reversal of the judgment is only required if the erroneous admission

of evidence is prejudicial, resulting in a miscarriage of justice. (Evid. Code, § 353; Cal. Const., art. 6, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) It is a miscarriage of justice if a result more favorable to defendant would have been attained in the absence of error. (*Watson*, *supra*, at p. 836.)

In this case, the evidentiary error unquestionably "was harmless in light of the strong evidence of defendant's guilt." (*People v. Homick* (2012) 55 Cal.4th 816, 872; accord, *People v. Weaver* (2001) 26 Cal.4th 876, 946.) The testimony of Davis and Ross, both impartial witnesses, amply established that defendant was residing with Jakeira during July, August and September 2011. That testimony, along with the testimony of the REACT officers that defendant registered as a transient during those months, established that defendant was guilty of the crimes with which he was charged.

In addition, the trial court instructed the jury to determine the facts "based only on the evidence that has been presented to you in this trial," and to "not let bias, sympathy, prejudice, or public opinion influence" its decision. (CALCRIM No. 200) The trial court also instructed the jury that defendant was presumed innocent and that the People had the burden of proving his guilt beyond a reasonable doubt. (CALCRIM No. 220) The jury received instructions regarding the sufficiency of circumstantial evidence and the requirement that the People prove each element of the crime beyond a reasonable doubt, as well as how to evaluate a witness's testimony. In addition, the trial court instructed the jury that "[n]either side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant" (CALCRIM No. 300) and that "[t]he testimony of only one witness can prove any fact" (CALCRIM No. 301). We presume that the jury understood and followed these instructions. (*People v. Homick*, *supra*, 55 Cal.4th at p. 853.)

And finally, in her final summation to the jury, the prosecutor stressed that it was not to speculate about what Jakeira and Jamila would have said since speculation was not

10

evidence.[5]  The prosecutor urged the jury to focus on the actual evidence before it, particularly the testimony of Davis and Ross.  In her summation to the jury, defense counsel emphasized that the absence of Jakeira and Jamila did not lessen the prosecution's burden of proof and that the jury could not assume that they would have given testimony favorable to the prosecution.

We conclude that based upon the strength of the evidence presented at trial, the instructions provided to the jury and counsels' summations to the jury, it is not reasonably probable that a result more favorable to defendant would have occurred if the challenged testimony of Detective Falvo and Investigator Arnwine had been excluded. The error in admitting this testimony was "manifestly harmless." (*People v. Weaver*, *supra*, 26 Cal.4th at p. 946.)

## DISPOSITION

The judgment is affirmed.

JACKSON, J.

We concur:

WOODS, Acting P. J.

ZELON, J.

---

[5]     This was a correct statement of the law.  (*People v. Waidla* (2000) 22 Cal.4th 690, 735 ["'speculation is not evidence'"]; *People v. Fielder* (2004) 114 Cal.App.4th 1221, 1234.)