Filed 9/16/16  P. v. Gomez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067978 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS255541) |
| JUAN GOMEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed.

Kimberly J. Grove, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L. Garland, Assistant Attorneys General, Charles C. Ragland and Samantha Louise Begovich, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Juan Gomez of conspiracy to commit the murder of Jordan Hickey (Pen. Code,[1] § 182, subd. (a)(1); count 1) and the first degree murder of Hickey (§ 187, subd. (a); count 2).[2] The jury found true allegations that one or more principals was armed with a firearm in connection with the murder (§ 12022, subd. (a)(1)) and a special circumstance that the murder was committed by means of discharging a firearm from a motor vehicle (§ 190.2, subd. (a)(21)). The trial court sentenced Gomez to life without the possibility of parole on the murder count plus one year for the firearm enhancement, and imposed but stayed the 25-year-to-life sentence on the conspiracy count. It ordered Gomez to pay restitution as well as various fines and fees, including a $10,000 parole revocation restitution fine.

Gomez contends the trial court prejudicially erred by (1) admitting into evidence two lines of rap lyrics he had written that should have been excluded as irrelevant and more prejudicial than probative; (2) failing to give necessary jury instructions relating to circumstantial evidence; and (3) imposing the probation revocation fine when his sentence does not include a period of parole. We reject these contentions and affirm the judgment.

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] The trial court severed Gomez's trial from that of his alleged co-conspirator, codefendant Humberto Emanuel Galvez. It also severed for trial an attempted robbery charge (§§ 664, 211) in connection with an unrelated incident.

2

FACTUAL AND PROCEDURAL BACKGROUND[3]

At about midnight on April 29, 2011, Gomez was driving with his younger cousin, codefendant Galvez, on Grove Street in National City when they saw Hickey walking on the sidewalk with his bicycle. Gomez knew that Galvez had a shotgun and was "hunting for humans." Gomez slowed the car down and made a U-turn to "get him," and Galvez shot Hickey three times from a distance of no more than two feet. Hickey was shot in the left elbow, leg and chest, collapsing both lungs and perforating his aorta and spinal cord, causing an extensive amount of bleeding and his death. Had Hickey survived, his left arm would have had to be amputated and he would have been paralyzed to some extent from the spinal cord injury.

Witnesses on Grove Street heard the three gunshots and one called 911, telling police it came from a large-caliber gun or shotgun. Another Grove street resident came upon the scene just as police drove up. He saw Hickey, who he described as having blue eyes and blond or reddish hair, lying on the sidewalk with his bicycle.

A sheriff's deputy investigating the matter checked surveillance video from nearby businesses, but the video did not give clues or hints about Hickey's murder. Other leads yielded nothing, causing the deputy to reach out to Crime Stoppers, which created flyers with a reward and put the information up on a billboard. Further investigative efforts

---

[3]    Some of the background facts are taken from transcripts of Gomez's recorded conversations with a confidential informant and Galvez, which were shown and provided to the jury at trial. Others are taken from Gomez's interview with detectives, which was also played for the jury at trial with transcripts provided to jurors.

3

failed, and eventually Hickey's case was featured on a television program, San Diego's Most Wanted.

In January 2012, an incarcerated individual came forward with information on Hickey's murder. The man became a cooperating informant, and he recorded telephone and in-person conversations with Galvez and Gomez for police. Following Galvez's and Gomez's arrests, Galvez admitted to detectives that he used a shotgun to kill Hickey.

During Gomez's interview with sheriff's deputies, Gomez initially denied knowing why he was in custody; that he was "clueless." He then told deputies he was drunk and was giving Galvez a ride when he "hear[d] shots and panicked . . . . That's it." Gomez claimed he drove away and argued with Galvez, asking him why he was shooting. He also told deputies that he did not know a person had gotten shot and did not see anyone on the side of the road. Gomez then stated he saw a person with a bicycle next to him, and "next thing I know" Galvez shot at him. Gomez told deputies it was three shots. Gomez eventually admitted that on the night of Hickey's murder he "kind of" knew Galvez was "looking for some fools"; that Galvez had a shotgun, and that Gomez was driving Galvez around while Galvez was hunting for humans. However, Gomez claimed it "wasn't [his] decision." During the interview, Gomez wrote an apology note to Hickey's mother, telling her he knew who killed her son but "never came clean"; he asked for her forgiveness and wrote he was "an accomplice of [*sic*] the crime and to live on I need your forgiveness."

After their police interviews, Gomez and Galvez were placed together in a room that police equipped for audio and video recording. At the outset of their recorded

4

conversation, Gomez asked Galvez, "How did they find out, dude?" He complained that the police "know a lot" and expressed suspicion that they "wired the pad." Gomez recounted to Galvez Gomez's conversation with one of the interviewing officers: "I just asked him now, 'How did you do it, man? After a year.' He's all, 'I do my homework.' 'Oh, you do your homework.' 'How did you know?' I go, because I remember that we didn't leave any traces." Gomez told Galvez that the police "already had us" and "[t]hey've had us for some time," expressing his dismay about how much police knew after such a long time: "A fucking year has gone by, gone by since what we did with that guy." Detectives returned to the room, and when one asked them if they wanted to say anything to Hickey's mother, both stated that they regretted what they had done. Gomez also repeated that he was drunk and "just drove." He also told another detective, "The only one I did was Grove"; "The only one that I was the driver on was the . . . Jordan Hickey one, all right?"

Deputies searching Gomez's residence found a notebook containing lyrics that Gomez authored. Before trial, the People sought to introduce the lyrics into evidence on the issue of Gomez's identity, pointing to a line—"three round bursting real military"—that was consistent with Hickey's murder by three high-caliber shots at close range. During argument on the matter, the lyrics were alternately referred to as "rap lyrics"; a "story," "recitation," or "poem"; or a "rap song about gang members fighting gang members." The parties later stipulated that Gomez authored the lyrics. However, the prosecutor continued to seek introduction of portions of the lyrics on the issue of

5

Gomez's mental state or intent.[4]  The court eventually excluded all gang references and the vast majority of the lyrics, but admitted into evidence two lines of the entire piece: "three round bursting real military weaponry.  Leaving cold cases for eternity."

At trial, the jury heard Gomez's recorded conversation in which he told the informant that he and Galvez were "sober"; that they "busted . . . a fool" and when they exited the car, there was "body fluid everywhere, fool, on the car, fool, on the side, fool, like . . . from the stomach fluid and shit that from the fool . . . ."  When asked if the person was an enemy, Gomez responded, "I don't even know what the fuck he was, fool.  Fool, we were just capping fools."  During the conversation, he told the informant that the person was from National City; he was on a bike on Grove Street; and that Gomez heard about it on "Cold Cases."  Gomez recounted:

"Gomez:  It was on Grove Street, fool.  We're going up . . . we're going downhill, fool, and we've seen him and I busted a U-turn, fool, to get that fool, dog.  Get him, fool.  [Galvez] got him.

---

4      In part, the prosecutor argued:  "What you have are rap lyrics that are going to have some embellishment, as the court said, because they're evocative rap lyrics that sound cooler when you sound a lot tougher than you really are.  [¶]  But what's critical in this case is it does describe Jordan Hickey's murder and it does put in context Mr. Gomez's state of mind, his intent.  He talks about, as the Court said, 'I'm gonna kill you.' We're killing people.  'three round bursting real military.'  And I understand that's all admissible, but you have to put the rest of it in context minus the specific gang references . . . .  [¶]  But what you're left with is the idea that this is Mr. Gomez's mental state and this is what it was when he killed Jordan Hickey, because he likes talking about it.  And he talks about how, before the three rounds bursting, 'I'm gonna kill you.  Riddla on da roof.  Survival syndrome.'  He's setting up this is how I feel, and when I have these three rounds bursting real military, it's 'cause that's what I do.  And that's what I just described to you in the lyrics what it is that gives him this complete mental state."

[¶] . . . [¶]

"[Informant]: . . . I seen him on America's Most Wanted that I guess, some fuckin' . . . I ain't trying to be burnt, fool, but, I heard about that shit.

"Gomez: That's on [Galvez] right there, fool. That was [Galvez's] ma- masterpiece, dog. . . . [¶] . . . [¶] . . . That fool just blasted him, fool. [¶] . . . [¶] . . . Pow, pow, pow, 'Let's go, fool.'

[¶] . . . [¶]

"[Informant]: Fuck it. That shit came out in American's Most Wanted, fool, and . . .

"Gomez: Cold Cases, fool."

The jury also heard portions of the conversation between Gomez and Galvez that was recorded by police after their respective arrests and interviews.

At trial, the deputy who directed the search of Gomez's home testified that Gomez's lyrics read in part: "three round bursting real military weaponry. Leaving cold cases for eternity."

During the People's closing argument, the prosecutor sought to contrast Gomez's apology letter to Hickey's mother with the lyrics Gomez wrote: "That [apology] letter, contrasted with what you heard in evidence, is the lyrics Mr. Gomez wrote. And the part you consider is 'three round bursting real military weaponry. Leaving cold cases for eternity.' Does that sound like 'I'm sorry, Ms. Hickey. I'm not responsible. In order to live on, I need your forgiveness?' Is that what it sounds like? No. That's what it sounds like in Mr. Gomez's head. That's what it sounds like in Mr. Gomez's head when he killed

7

Jordan Hickey and he bragged about it and he wrote these lyrics. That's what he was thinking. Contrast these two letters [*sic*] and you know what his real intent is and was."

In his closing argument, Gomez's counsel conceded that Galvez shot Hickey and that Gomez was driving the vehicle on the night of Hickey's murder, but that the issue for the jury was Gomez's mental state: "There is no question, no doubt in your mind, in anyone's mind in this courtroom who sat through the evidence or even beforehand that Juan Gomez was driving that car. And there's no question in any of your minds or in anyone's mind here today that Mr. Galvez gunned down Jordan Hickey. [¶] You know that. I know that. You don't need to think about that anymore as far as if it happened. I told you from the beginning that this . . . was going to be a much more subtle case. You were going to have to make a much more difficult subtle decision about what was in the mind and in the heart of this young man when Mr. Galvez killed Jordan Hickey. That's the decision you have to come to. [¶] Because the law in this case says to you to know what somebody wants to do is not to want it necessarily, and that's not enough. To know what they're going to do, be there and not stop it isn't enough. You can be that coward. . . . [¶] You have to want it in your mind and in your heart to kill. That's what this case is about. And if you have any question, any reservation, any rational question in your mind whether or not [Gomez] wanted to kill, then he's not guilty of first degree murder." As for Gomez's two lines of lyrics, Gomez's counsel argued: "You have evidence that this notebook is, from cover to cover, filled with rap lyrics. And you have these two lines about three bursts military automatic. Well, if you've been in the military, you know military weapons can fire in three bursts or single rounds or fully auto. Why is he

8

presenting that?  Pages and pages of lyrics written by Mr. Gomez, information, and these two lines out of context.  [¶]  [The prosecutor successfully objects on grounds the argument states facts not in evidence.]  [¶]  . . .  It doesn't help you in making your decision.  It's inflammatory.  . . .  It's his evidence.  What are the facts?"

## DISCUSSION

### I. *Admission of Gomez's Lyrics into Evidence*

Pointing out the two lines of rap lyrics—"three round bursting real military weaponry.  Leaving cold cases for eternity"—were part of a larger set of lyrics that included references to gang membership and gang activities, Gomez contends the trial court prejudicially erred by permitting the prosecutor to introduce those two lines into evidence on the theory that they went to Gomez's mental state or intent.  Gomez maintains the evidence did not tend logically, naturally or by reasonable inference to establish any fact material for the People or to overcome any material fact the defense sought to prove; that it led only to a speculative inference regarding Gomez's intent at the time of Hickey's homicide, and thus it was irrelevant under Evidence Code section 350.  Gomez further contends that the effect of the court's ruling was that the People got the "benefit of gang lyrics without calling them gang lyrics," and thus the evidence should have been excluded under Evidence Code section 352 because its probative value was slight and potential for prejudice substantial as the lyrics were taken out of context, thereby confusing the issues and misleading the jury.

9

A. *Legal Principles and Standard of Review*

"The general framework for the admission of evidence as it relates to defendant['s] challenge[ ] is as follows.  Only relevant evidence is admissible.  [Citation.]  Relevant evidence is broadly defined as that having a 'tendency in reason to prove or disprove any disputed fact that is of consequence' to resolving the case." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 405.)  " ' "The test of relevance is whether the evidence tends 'logically, naturally, and by reasonable inference' to establish material facts such as identity, intent, or motive.  [Citations.]" [Citation.] [¶] . . .' [Citation.] '[T]he trial court has broad discretion to determine the relevance of evidence.' [Citation.]  This discretion extends to evidentiary rulings made pursuant to Evidence Code section 352." (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)  Evidence Code section 352 permits the court to exclude evidence in its discretion "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  Prejudicial evidence means " 'evidence which uniquely tends to evoke an emotional bias against defendant as an individual and which has very little effect on the issues.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 320.)  " 'In applying [Evidence Code] section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.)

We review the trial court's evidentiary rulings for abuse of discretion.  (*People v. Clark* (2016) 63 Cal.4th 522, 597; *People v. Bryant, Smith and Wheeler*, *supra*, 60

Cal.4th at p. 405.)  "A court abuses its discretion if it acts 'in an arbitrary, capricious, or patently absurd manner.' "  (*People v. Boyce* (2014) 59 Cal.4th 672, 687.)

B.  *Analysis*

Gomez's isolated lyrics showed similarities to Hickey's murder in that Hickey sustained three shotgun shots and it became a cold case.  In that way, they were arguably pertinent to Gomez's knowledge about details of Hickey's murder and his involvement in it.  But those issues were uncontested at trial, eliminating any relevance on those grounds. (Evid. Code, §§ 210, 350; *People v. Coleman* (1979) 89 Cal.App.3d 312, 321 ["Evidence presented on a *nondisputed* issue is irrelevant and, hence, inadmissible"].)  And we question whether those lyrics had a tendency in reason to prove that Gomez harbored an intent to kill Hickey when he drove Galvez and facilitated Hickey's killing on the night of the murder.  The People maintain that on the intent issue, the lyrics were inherently relevant and admissible under Evidence Code sections 1220 and 1250 as, respectively, a party admission and evidence of Gomez's then existing state of mind to prove his state of mind at another time.[5]  There is authority that would permit us to conclude that the fact

---

5      Evidence Code section 1220 provides in part:  "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity . . . ."  Evidence Code section 1250 provides:  "(a) Subject to Section 1252 [relating to lack of trustworthiness], evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶]  (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶]  (2) The evidence is offered to prove or explain acts or conduct of the declarant.

11

Gomez's writing may be characterized as a party statement or admission so as to avoid the hearsay rule does not permit its introduction into evidence if the writing has no relevance. (See, e.g., *People v. Castille* (2005) 129 Cal.App.4th 863, 875-876 ["Simply stated, and as a general rule, if a party to a proceeding has made an out-of-court statement *that is relevant and not excludable under Evidence Code section 352*, the statement is admissible against that party declarant," italics added]; but see *People v. Epperson* (1985) 168 Cal.App.3d 856, 861 ["A statement is an admission for purposes of Evidence Code section 1220 if it was made by a party and offered against him, without reference to what it tends to prove"].) Other authority suggests that the fact that evidence falls within a hearsay exception and is not otherwise inadmissible does not mean a trial court may necessarily dispense with a relevance or Evidence Code section 352 analysis. (See *People v. Kraft* (2000) 23 Cal.4th 978, 1032-1036 [trial court properly admitted handwritten "death list" as a coded list of defendant's victims because it reasonably concluded (1) it was relevant to a disputed fact of consequence to the case (defendant's awareness of characteristics of the murders); (2) the entries reflected a sufficient nexus with some aspect of the case; (3) the list was admissible under the Evidence Code section 1220 hearsay exception for a party statement, and (4) the list was more probative than prejudicial]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049 ["Concluding that defendant's statement was not excludable under the hearsay rule does not, of course, necessarily mean it was admissible"].)

[¶] (b) This section does not make admissible evidence of a statement of memory or belief to prove the fact remembered or believed."

We need not resolve these evidentiary issues because we conclude that even assuming arguendo the court abused its discretion in admitting the evidence, Gomez has not shown its admission prejudiced him. Prejudice is not presumed, but must be affirmatively demonstrated. (*People v. Bell* (1998) 61 Cal.App.4th 282, 291.) This court may only reverse the judgment if the erroneous admission of evidence is prejudicial, resulting in a miscarriage of justice. (Evid. Code, § 353; Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) " '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *Watson*, at p. 836; see *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787, fn. 53.)

Gomez's showing does not meet this prejudice standard. His sole argument on the point is that the court's alleged error deprived him of the opportunity to be convicted on " 'relevant, nonprejudicial evidence,' " and that "[t]he danger of the jury convicting [him] based upon something other than admissible evidence was real since the central dispute with regard to the primary charge of murder involved [his] intent, a matter not readily susceptible to proof." We are unpersuaded. The references to these lyrics during trial was brief, and they contained no gang references. Any evidentiary error in admitting these two lines of written text unquestionably would have been harmless in light of the other evidence of Gomez's intent to kill for purposes of first degree murder, conspiracy,

and the special circumstance allegation.[6]  (See *People v. Homick* (2012) 55 Cal.4th 816, 872; accord, *People v. Weaver* (2001) 26 Cal.4th 876, 946.)  Gomez does not challenge the sufficiency of the evidence of intent necessary for these charges or allegations.  And here, the evidence amply supports the jury's finding that Gomez personally possessed an intent to kill.[7]  Gomez admitted to detectives during his interview that he knew Galvez had a shotgun and was out "hunting humans."  Gomez previously told the informant during their recorded conversation that they were out "just capping fools," and after he and Galvez spotted Hickey, Gomez made a U-turn so that Galvez could "get that fool . . . ."  There was no dispute at trial that Gomez was driving the vehicle from which Galvez fired multiple shots at Hickey at close range with his shotgun.  Evidence that a

[6]      In connection with the conspiracy, the court instructed the jury in part that "the People have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent to agree and did agree with the other principal to intentionally and unlawfully kill.  If the People have not met this burden, you must find the defendant not guilty of conspiracy as charged in Count 1."  The court instructed the jury that to prove the special circumstance allegation true, "the People must prove that:  Humberto Galvez shot a firearm from a motor vehicle, killing Jordan Hickey; two, Humberto Galvez intentionally shot at a person who was outside the vehicle; and, three, at the time of the shooting, the defendant intended to kill."  By convicting on first degree murder and conspiracy, and by finding the special circumstance allegation true, the jury necessarily resolved the factual question of Gomez's mens rea, his intent to kill, adversely to him.

[7]      An aider and abettor may be convicted of first degree premeditated murder when the evidence shows "the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission."  (*People v. Chiu* (2014) 59 Cal.4th 155, 167; see also *People v. Lee* (2003) 31 Cal.4th 613, 624 ["When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[ ] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime' "]; *People v. Beeman* (1984) 35 Cal.3d 547, 560.)

person aims and deliberately shoots at a vital area of a person's body at close range can support a verdict of premeditated and deliberate first degree murder. (See *People v. Koontz* (2002) 27 Cal.4th 1041, 1082; see also *People v. Tafoya* (2007) 42 Cal.4th 147, 189 [" '[A]n execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive' "]; *People v. Rand* (1995) 37 Cal.App.4th 999, 1001-1002.) After their arrest, Gomez complained to Galvez that police had found out "what we did to that guy," despite the fact "we didn't leave any traces." We see no indication that the jury would have reached a different conclusion about Gomez's intent had they not heard the two lines of his rap lyrics. In short, Gomez cannot meet his burden of establishing a reasonable probability—one that is sufficient to undermine the confidence in the jury's convictions—that he would have received a more favorable result had the court excluded the lyrics.

## II. *Claims of Instructional Error*

Following the presentation of evidence, the trial court instructed the jury with CALCRIM No. 223 as to direct and circumstantial evidence and CALCRIM No. 225 regarding circumstantial evidence of a defendant's intent or mental state.

Specifically, it instructed: "Facts may be proved by direct or circumstantial evidence or by a combination of both. . . . Circumstantial evidence also may be called indirect evidence. Circumstantial evidence does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if the witness testified

15

that he saw someone come inside wearing a raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside.

"Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence." (CALCRIM No. 223.)

"The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent and/or mental state. The instruction for each crime and allegation explains the intent and/or mental state required.

"An intent or mental state may be proved by circumstantial evidence.

"Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.

"Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent and/or mental state, you must be convinced that the only reasonable conclusion supported by circumstantial evidence is that the defendant had the required intent and/or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent and/or mental state and another reasonable conclusion supports a finding that the defendant did not, you must

16

conclude that the required intent and/or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 225.)

As to the special circumstance allegation, the court instructed with CALCRIM No. 700, providing that the People had the burden of proving the special circumstance beyond a reasonable doubt, CALCRIM No. 705 regarding circumstantial evidence of intent or mental state for purposes of the special circumstance allegation,[8] and CALCRIM No. 735, stating the elements of the special circumstance of committing murder by shooting a firearm from a moving vehicle.

Gomez contends the court erred by failing to additionally instruct the jury sua sponte with CALCRIM No. 224 as to the sufficiency of circumstantial evidence,[9] and

---

[8] The court read CALCRIM No. 705 in part as follows: "Before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to conclude that the defendant had the required intent or mental state, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent or mental state. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the defendant did have the required intent or mental state and another reasonable conclusion supports a finding that the defendant did not have the required intent or mental state, you must conclude that the required intent or mental state was not proved by the circumstantial evidence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

[9] As the People point out, Gomez's counsel was given a choice and asked the trial court to instruct with CALCRIM No. 225 rather than CALCRIM No. 224. "CALCRIM No. 224 corresponds to [former] CALJIC No. 2.01 and CALCRIM No. 225 corresponds to [former] CALJIC No. 2.02. Case law addressing CALJIC instructions is still generally

17

CALCRIM No. 704, regarding circumstantial evidence of special circumstances.[10]  As we explain, the contentions are unavailing.

A. *The Court Did Not Err by Declining to Instruct the Jury with CALCRIM No. 224*

CALCRIM No. 224 "describes the manner in which the jury is to consider circumstantial evidence that the prosecution offers to prove facts necessary to find a defendant guilty." (*People v. Contreras*, *supra*, 184 Cal.App.4th at p. 591.)  The instruction provides:  "Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable

applicable to the corresponding CALCRIM instruction."  (*People v. Contreras* (2010) 184 Cal.App.4th 587, 591, fn. 4.)

10    CALCRIM No. 704 reads:  "Before you may rely on circumstantial evidence to conclude that a special circumstance allegation is true, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶]  Also, before you may rely on circumstantial evidence to find that a special circumstance allegation is true, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the special circumstance allegation is true.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions supports a finding that the special circumstance allegation is true and another reasonable conclusion supports a finding that it is not true, you must conclude that the allegation was not proved by the circumstantial evidence.  However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

18

conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable." (CALCRIM No. 224.)

Both CALCRIM Nos. 224 and 225 explain how to consider circumstantial evidence, but CALCRIM No. 224 is " 'more inclusive.' " (*People v. Contreras*, *supra*, 184 Cal.App.4th at p. 592, quoting *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1172.) CALCRIM No. 224 must be given sua sponte when the prosecution substantially relies on circumstantial evidence to prove any element of the case. (*Samaniego*, at p. 1171.) But it "should not be given where circumstantial evidence is incidental to and corroborative of direct evidence." (*Ibid*.) And "CALCRIM No. 225 is to be used in place of CALCRIM No. 224 'when the defendant's specific intent or mental state is the only element of the offense that rests substantially or entirely on circumstantial evidence.' " (*Id.* at pp. 1171-1172; *People v. Bloyd* (1987) 43 Cal.3d 333, 351.)

Here, the People's case against Gomez was almost exclusively focused on proving his intent or mental state on the night of Hickey's killing. The evidence of Gomez's guilt otherwise rested substantially on direct evidence, including testimony from law enforcement and the medical examiner, Gomez's apology letter, and Gomez's incriminating statements to the informant (telling him he and Galvez were "just capping fools" and he made a U-turn so that Galvez could "get" Hickey), to the detectives who interviewed him, and to Galvez during their time alone in the interview room. Defense counsel conceded that Gomez participated as the driver and that Galvez murdered Hickey by shooting him at close range with a shotgun. Under the circumstances, the court

19

properly instructed the jury only with CALCRIM No. 225. (*People v. Samaniego*, *supra*, 172 Cal.App.4th at pp. 1171-1172.)

Gomez nevertheless argues that CALCRIM No. 224 "would have informed the jurors how to evaluate circumstantial evidence relating to factual issues such as whether or not an agreement existed with respect to the conspiracy charge." But on this point as well, the issue was Gomez's specific intent or mental state to agree or conspire with Galvez. (See *People v. Johnson* (2013) 57 Cal.4th 250, 262 ["traditional conspiracy requires both the specific intent to agree, and specific intent to commit a target crime"]; *People v. Cortez* (1998) 18 Cal.4th 1223, 1232 ["[C]onspiracy is a specific intent crime requiring both an intent to agree or conspire and a further intent to commit the target crime or object of the conspiracy"].) We again conclude the trial court properly instructed the jury with CALCRIM No. 225, which told the jury how to consider circumstantial evidence on the issue of intent or mental state.

B. *The Court Did Not Err by Declining to Instruct the Jury with CALCRIM No. 704*

On similar grounds, we reject Gomez's contention that the court erred by failing to instruct the jury with CALCRIM No. 704, regarding the use of circumstantial evidence with respect to a special circumstance allegation. Gomez argues that the instruction "would have informed the jurors how to evaluate circumstantial evidence relating to whether or not the shots were fired from a motor vehicle . . . ." However, again, the People relied substantially on direct evidence—Gomez's admissions and incriminating statements to officers and the informant—to prove that Gomez was driving the vehicle

20

from which Galvez fired the shotgun at Hickey. " 'It is the general rule that a trial court is not required to instruct on the rules of law applicable to circumstantial evidence where the alleged circumstantial evidence is incidental to, and corroborative of, direct evidence.' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1142, quoting *People v. Malbrough* (1961) 55 Cal.2d 249, 250-251.) Though the People relied on circumstantial evidence of Galvez's intent to kill, that issue was addressed by the court's instruction with CALCRIM No. 705, which told the jury how to consider circumstantial evidence as to Gomez's intent or mental state, and was properly given in place of CALCRIM No. 704. (See Use Note to CALCRIM No. 705 ["If intent or mental state is the only element of the special circumstance that rests substantially on circumstantial evidence, then this instruction should be given in place of CALCRIM No. 704"].) The court did not err with respect to the jury instructions.

### III. *Parole Revocation Restitution Fine*

During Gomez's sentencing, the trial court imposed a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), as well as a $10,000 parole revocation restitution fine under section 1202.45, which would become effective if his parole is revoked. Characterizing his sentence as merely a term of life without the possibility of parole, Gomez asks us to strike the $10,000 parole revocation restitution fine. He contends that section 1202.45, which authorizes the fine, does not apply because his sentence does not include a period of parole. He is mistaken.

Section 1202.45, subdivision (a) provides: "In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the court shall, at

21

the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."[11] "Under section 1202.45, a trial court has *no* choice and *must* impose a parole revocation fine equal to the restitution fine whenever the 'sentence includes a period of parole.' " (*People v. Smith* (2001) 24 Cal.4th 849, 853.)

Thus, where the only sentence imposed is life without the possibility of parole, there is no parole eligibility and the fine is not applicable. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 63; *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 (*Oganesyan*).) But when a defendant is sentenced to state prison, his sentence usually includes a period of parole supervision. (*People v. Preston* (2015) 239 Cal.App.4th 415, 424-425, citing section 3000, subd. (a)(1); see also *People v. Nuckles* (2013) 56 Cal.4th 601, 609.)

In *People v. Brasure* (2008) 42 Cal.4th 1037, 1075, the California Supreme Court held the trial court properly imposed a parole revocation fine on a defendant sentenced to death as well as other determinate prison terms under section 1170, subdivision (h). It pointed to section 3000, subdivision (a)(1), which provides: " 'A sentence resulting in imprisonment in the state prison pursuant to Section 1168 or 1170 shall include a period of parole supervision or postrelease community supervision, unless waived.' " The court

---

11    Section 1202.4, subdivision (b), provides: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record."

held that because the defendant's sentence included a period of parole under section 1170, the fine was required to be imposed and suspended unless and until the defendant was released on parole and parole was revoked. (*Brasure*, at p. 1075.)

Here, in addition to Gomez's count 2 sentence of life without the possibility of parole, Gomez was sentenced to an indeterminate term of 25 years to life on count 1 under section 1168. Subdivision (a)(1) of section 3000 expressly applies to sentences imposed under section 1168. Accordingly, the sentence "shall include a period of parole" and is subject to a suspended parole revocation fine under section 1202.45.

Gomez's cited authorities do not persuade us otherwise. In *People v. Battle*, *supra*, 198 Cal.App.4th 50, the defendant was sentenced only to an indeterminate sentence of life without the possibility of parole (with additional terms stayed under section 654), and the Attorney General conceded a parole revocation restitution fine was improper. (*Id.* at pp. 58, 63.) In *People v. McWhorter* (2009) 47 Cal.4th 318, the California Supreme Court accepted the People's concession and struck a parole revocation fine where the defendant was sentenced to death as well as some other unspecified term on a first degree residential robbery. (*Id.* at p. 380.) The *McWhorter* court's decision was without analysis other than to cite *Oganesyan*, *supra*, 70 Cal.App.4th 1178. (*McWhorter*, at p. 380.) To the extent the *McWhorter* court's conclusion conflicts with *People v. Brasure*, *supra*, 42 Cal.4th 1037, we elect to follow *Brasure*'s reasoned and developed analysis. (Cf. *McHugh v. Santa Monica Rent Control Bd.* (1989) 49 Cal.3d 348, 358 ["When . . . a decision treats an issue in a 'summary and conclusory' manner, and is 'virtually devoid of reasoning,' its authoritative status is undermined"].)

In *Oganesyan*, the Court of Appeal held a parole revocation fine was properly rejected where a defendant was sentenced to life without the possibility of parole for first degree special circumstance murder and, on a separate count, an indeterminate term of 15 years to life for second degree murder, plus a four-year firearm enhancement. (*Oganesyan*, *supra*, 70 Cal.App.4th at pp. 1181, 1184.) In part, the court reasoned that because the defendant's "overall sentence" did not "presently" allow for parole, and there was no evidence it ever would, no additional restitution fine was required. (*Id*. at p. 1185.) It explained that the purpose behind the restitution fine scheme was to recoup costs resulting from parole revocation, and because the chance of such recoupment was extremely rare, the Legislature could not have intended the scheme to apply "under such unlikely circumstances." (*Id*. at p. 1185 & fn. 3.) In *Brasure*, however, the court distinguished *Oganesyan*, and declined to change its conclusion on grounds the parole period was unlikely to be served: "As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine. Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*People v. Brasure*, *supra*, 42 Cal.4th at p. 1075.)

*Brasure* essentially disapproved *Oganesyan*'s underlying reasoning, and thus we decline to follow *Oganesyan*, *supra*, 70 Cal.App.4th 1178. Gomez's indeterminate sentence carried with it a possibility of a period of parole and mandated imposition of the

24

section 1202.45 parole revocation restitution fine. As in *Brasure*, *supra*, 42 Cal.4th 1037, Gomez "is in no way prejudiced by assessment of the [suspended parole revocation] fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Id*. at p. 1075.)

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

NARES, J.