Filed 9/30/16  P. v. Bryant CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B264128 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA099959) |
| v. | |
| DANNON R. BRYANT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Reversed.

Sunnie L. Daniels, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Michael Katz, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury found Dannon R. Bryant (Bryant) guilty of (a) injuring a spouse, cohabitant or girlfriend, a felony violation of Penal Code[1] section 273.5, subdivision (f)(1) and (b) disobeying a court order, a misdemeanor and a violation of section 166, subdivision (a)(4). The court sentenced Bryant to nine years in state prison.

On appeal, Bryant advances two principal arguments. First, he contends that the trial court abused its discretion by discharging a seated juror without good cause prior to deliberations. Second, Bryant argues that his conviction must be overturned because the trial court failed to allow him to impeach the victim's hearsay statements with her prior felony convictions and that this error prejudiced his defense. While the People reject the notion that the trial court abused its discretion in excusing the juror, they concede that the trial court did in fact err with regard to the exclusion of the victim's prior felony convictions; however, the People contend that this error was harmless.

We hold that the trial court had good cause to excuse the juror and, as a result, did not abuse its discretion. We hold further that the trial court should not have precluded Bryant from impeaching the victim's credibility with her prior convictions and that such an error was not harmless. Accordingly, we reverse the judgment.

## BACKGROUND

### I.     The incident

On August 17, 2014, Dorothy Williams (Williams) called 911 from her apartment. According to the transcript of that call, Williams said that a man against whom she had a restraining order[2] had walked into her apartment without her permission and, as a result, she had locked herself in the bathroom. While she was on the phone with the 911 operator, she repeatedly pleaded for the operator to tell the police to "hurry up." In

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] According to a protective order running from August 21, 2013 through August 21, 2016, Bryant was supposed to stay at least 100 yards away from Williams (the 2013 protective order). The court issued the 2013 protective order because there had been a domestic violence incident between Bryant and Williams, with Bryant hitting Williams.

addition, Williams was heard yelling, "Get away from me," "Leave me alone," "He's hitting me!. . . . Help me! Help me!" "Oh, oh my God! Help me!" The transcript also recorded a man's voice calling Williams a "dumb bitch," a "stupid ass bitch," and a "bitch," and telling her to "sit you[r] ass there" and "get the fuck out of there."

When the police arrived, they found Williams outside her apartment and across the street. According to the police, she looked "very upset" and "beat up." She was "shaking" and it appeared that she had been crying. She appeared to be happy to see the police. Photos of Williams showed a bloody lip, a swollen left eye, scratch marks on her face, and teeth "full of blood," which appeared to be "fresh." Williams told one of the responding officers that Bryant had punched her five or six times while she was standing and while she was prone on the floor of the apartment.

Police found Bryant in the alley behind Williams's apartment. At that time, Bryant appeared "calm" and did not appear to be suffering from any injuries. Bryant told the police that he had merely stopped by Williams's apartment to give her some money when she suddenly went "out of control," and started "tripping."

## II. The preliminary hearing

On October 14, 2014, the court held a preliminary hearing stemming from the incident on August 17, 2014 at Williams's apartment. Williams testified for the People, but her testimony was markedly different than the statements she made to the 911 operator and to the responding police officers.

First, Williams testified that she had lied to the police when she told them that Bryant had just "walked in" to her apartment uninvited. According to Williams, Bryant had been living with her at her apartment for the last two years and had continued to live with her, at her invitation, despite the issuance of the 2013 protective order requiring Bryant to stay 100 yards away from Williams. Second, Williams testified that she had lied to the police officers when she said that Bryant had punched her five or six times. Third, Williams testified that after finding some text messages on Bryant's phone that suggested Williams may have been cheating on her, she became "very mad," "very emotional," and "pushed" and "hit" Williams, causing him to "hit [her] back." In other

3

words, she was the "aggressive one," the one who "hit first." Specifically, Williams testified that she pushed Bryant into the dining room table and then scratched his back. Williams also admitted that she had been drinking alcohol the night before and on the day of the incident and that drinking makes her "very aggressive." Despite Williams's testimony that she had lied to the responding police officers, the court found that there was "sufficient cause to believe that [Bryant was] guilty."

On October 28, 2014, the People filed a two-count information, alleging that Bryant had injured a spouse, cohabitant or girlfriend (§ 273.5, subd. (f)(1)) and had disobeyed a court order (§ 166, subd. (a)(4)). At his arraignment later that same day, Bryant pleaded not guilty to both counts.

## III. The trial

At trial, the People's principal theme was "[h]e did it again," arguing that Bryant was a serial abuser. In addition to the 2013 and 2014 incidents involving Williams, the People introduced evidence regarding a 2007 incident between Bryant and his former wife, Teresa Lopez (Lopez). Lopez testified that in 2007, during an argument, Bryant hit her while she was holding one of their children and then pushed her to the ground and kicked her, sending her to the hospital with scratches, bruises and a swollen bloody lip. A principal theme of the defense was relative credibility—that is, Bryant was more credible than Williams. In order to establish that Bryant was the more credible witness, the defense employed a two-pronged strategy. First, Bryant testified on his own behalf. On the stand, he freely admitted, inter alia, to his prior acts of domestic violence against Lopez in 2007 and Williams in 2013, accepted "full responsibility" for his misconduct and stressed that he was "apologetic" and "very sorry." As to the 2013 incident involving Williams, Bryant testified that he had pleaded "no contest" because he was guilty of the misconduct. The clear implication of this testimony about the prior incidents was that Bryant was contesting the 2014 charges because he was not guilty, a point that his

4

counsel made express during closing argument.[3]  Second, the defense contrasted Bryant's live, in-court testimony with the preliminary hearing testimony of Williams, which was read to the jury.  The defense utilized the preliminary hearing testimony in which Williams admitted lying to the police on several relevant matters, because she elected to invoke her Fifth Amendment right against self-incrimination and, as a result, the court found her unavailable to testify at trial.

To bolster its argument that Bryant was the more credible witness, the defense attempted to introduce evidence of Williams's prior convictions.  Before the presentation of any evidence to the jury, defense counsel announced that he intended to present evidence of Williams's prior convictions to impeach the credibility of her statements to the 911 operator.  The trial court ruled, over the objection of Bryant's counsel, that "[h]er prior record does not come in unless she testifies."  After the People rested, the prosecutor submitted to the trial court Williams's "rap sheet," which showed, inter alia, that she had suffered felony convictions for receiving stolen property (§ 496) in 1998, grand theft (§ 487) and receiving stolen property (§ 496) in 1999, and receiving stolen property (§ 496) in 2001.  She had also suffered a misdemeanor conviction for joyriding (Veh. Code, § 10851) in 2008 and a possible conviction in 2013 for disobeying a lawful court order.  After Williams invoked her Fifth Amendment privilege against self-

---

[3] With regard to the 2014 incident, Bryant testified as follows:  Williams, after she found suspicious photos on his cell phone, accused him of cheating on her and threatened to send him to jail for violating the 2013 protective order.  Williams then took Bryant's cell phone into the apartment's bathroom and used its speaker phone function to call 911.  When  Bryant heard through the bathroom door that Williams was calling 911, he began to gather up his "stuff," such as his shoes and shirt, in preparation for leaving the apartment, because under the terms of the protective order he was not supposed to be there.  As he was preparing to leave the apartment, Williams exited the bathroom, pushed him, kicked him, and then hit him in the back with her key chain, scratching his back.  When Williams hit Bryant in the back with her keys, Bryant "react[ed]," snapping backward and hitting Williams  in the face with either the back of his head or his elbow.  Bryant also admitted that he lied to the police when he told them he had never gone inside Williams's apartment, because he did not want to be found in violation of the 2013 protective order.

incrimination outside the presence of the jury, and after the defense read Williams's preliminary hearing testimony to the jury, Bryant's counsel again sought to present evidence of Williams's prior convictions. Once again, the court denied the request, ruling that the defense cannot introduce any of Williams's prior convictions, explaining that the defense "can't impeach somebody who is not here, just like the People cannot."

On March 2, 2015, the jury, after deliberating for the better part of two days, found Bryant guilty on both counts. On May 12, 2015, the court, after striking one of Bryant's two prior "strike" convictions, sentenced Bryant to nine years in state prison. Bryant timely appealed.

## DISCUSSION

### I.    The trial court properly excused Juror No. 7

On February 25, 2015, the first day that the jury heard evidence, the court received a note from juror number 7 (Juror No. 7). The note stated, "Unfortunately, due to my beliefs and morals, I would not be able to . . . pas[s] judgment[] against defendant. Sorry I did not bring this to your attention yesterday."

Outside the jury's presence, the court told Juror No. 7, "Well, you are not making a . . . moral decision on the defendant. You are simply making a factual decision as to whether or not something happened. So if [the prosecutor] presents evidence and persuades you beyond a reasonable doubt, could you vote guilty?" Juror No. 7 replied, "Yes. If—yeah." He also agreed that he could acquit Bryant if the People failed to prove their case. The court stated, "So you can, in fact, perform your duties as a juror, determine facts, apply the law, [and] come to a conclusion." When Juror No. 7 agreed, the court then asked, "So what is this about, then?"

Juror No. 7 explained his changing positions as follows: "Sorry. You know, . . . —before coming into jury service, my family kind of shook me up a little bit about, you know, you know, doing jury duty, that's why, but I thought about it for a little bit, you know. I honestly wish I hadn't written that now."

In response, the court repeatedly probed the strength of Juror No. 7's position: "I want to make sure that we have 12 jurors who could be fair, [and] perform [their] duties.

6

[¶] So are you saying that you wish to withdraw this note at this point?" Juror No. 7 affirmed that he did. The court asked again whether Juror No. 7 could perform his duties and, again, Juror No. 7 stated that he could.

In a sidebar discussion with both counsel, the court stated that it was troubled by Juror No. 7's alternating representations: "[H]e says that he cannot make a decision based on his moral issues, that he cannot judge people. So yesterday when I asked him initially he said he would be able to do his duties, then he writes a note that says he cannot do that, now he said he can." The court was troubled because it is "pretty important for a juror to indicate whether or not they would be able to perform their duties." The court summarized the problem as follows: "So, at this point, we have three separate stories. . . . [H]e told the court yesterday that he had no problem, he didn't raise any of these issues, and this morning he sends a note indicating that he cannot perform his duties because he has got moral issues and that he doesn't want to judge people. And then, after lunch he changes his mind and he says that, basically, he has been pressured by the family. Now he can, in fact, do it. [¶] . . . [H]e basically told the court three separate positions on two consecutive days, [and] two positions in one day. So, based on that, . . . I just don't think that he could be a fair [and] impartial juror because he has not told the court an honest answer."

After considering argument from Bryant's counsel against dismissal, the court found good cause to excuse Juror No. 7: "I will find cause. He clearly has told the court three separate answers within two days. And we just took way too much time to make sure that we have 12 jurors and two alternates who could be fair and impartial. And based on his response, I just don't think he can, in fact, be an impartial juror. I don't think he can perform his duties. So, therefore, I am going to excuse him for cause."

On appeal, Bryant argues that the dismissal of Juror No. 7 was improper because there was "no lawful justification" for the trial court's decision. As discussed below, we disagree.

7

A.     STANDARD OF REVIEW

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is "'capable and willing to decide the case solely on the evidence before it.""" (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294.) "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, . . . the court may order the juror to be discharged . . . ." (§ 1089; see *People v. Farnam* (2002) 28 Cal.4th 107, 140–141.) "What constitutes good cause rests largely in the discretion of the trial court." (*People v. Taylor* (1961) 189 Cal.App.2d 490, 495; *People v. Manriquez* (1976) 59 Cal.App.3d 426, 431.)

1.     *Typical abuse of discretion standard for reviewing a trial court's methods in determining whether to excuse a juror*

"'Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty "to make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1029.) Because a court confronted with possible grounds for dismissal must thread the proverbial needle between conducting an inquiry that is "adequate" but not "overly invasive," a court is accorded "'broad discretion'" when it comes to "[t]he *manner* in which [it] conduct[s] its inquiry." (*People v. Fuiava* (2012) 53 Cal.4th 622, 710, 712 (*Fuiava*); *People v. Clark* (2011) 52 Cal.4th 856, 971.)

For example, the trial court need not engage in prolonged questioning of the juror who is at issue. As explained by *Fuiava*, *supra*, 53 Cal.4th 622: "We reject the notion that a trial court, having received an admission of disabling bias from a juror, is always required to attempt, in essence, to rehabilitate that juror by further exploring what the juror really meant. We have recognized—in the context of the evaluation of prospective jurors during voir dire—that a trial court has the 'discretion to decide that a juror's disqualification is so clear that further voir dire is pointless . . . .'" (*Id.* at p.714.)

2. *Heightened abuse of discretion standard for reviewing a trial court's decision to excuse a juror*

While the "*manner* in which the trial court conducted its inquiry is subject to review for abuse of discretion under the typical standard" (*Fuiava*, *supra*, 53 Cal.4th at p. 712), "an appellate court's review of the *decision* to remove a seated juror is *not* conducted under the typical abuse of discretion standard, but rather under the 'demonstrable reality' test." (*Id.* at p. 711, italics added.)

As explained by our Supreme Court in *Fuiava*, *supra*, 53 Cal.4th 622, "[t]he typical abuse of discretion standard involves an analysis of whether the trial court's decision is supported by '"substantial evidence"' and 'has been characterized as a "deferential" standard.'" (*Id.* at p. 711.) Under this deferential standard, "'[e]ven when there is a significant amount of countervailing evidence, the testimony of a single witness that satisfies the standard is sufficient to uphold the finding.'" (*Ibid.*) *Fuiava* further explained that, "[i]n contrast, '[t]he demonstrable reality test entails a more comprehensive and less deferential review. It requires a showing that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.'" (*Id*. at p. 712.) In applying the more stringent demonstrable reality standard of review, we consider "'not just the evidence itself, but also the record of reasons the court provides.'" (*Ibid.*.) The "heightened" and "more stringent" demonstrable reality standard "more fully reflects an appellate court's obligation to protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1052)

However, as *Fuiava*, *supra*, 53 Cal.4th 622 also made clear, the demonstrable reality test does not permit the reviewing court to re-evaluate the evidence: "'It is *important* to make clear that a reviewing court does *not reweigh* the evidence under either test.'" (*Id*. at p. 712, italics added.) "As we have consistently cautioned, however, even under the demonstrable reality standard the  reviewing court does *not* reweigh the

persuasive value of the evidence." (*Id.* at p. 714, italics added.[4]) "[E]ven when there is conflicting evidence of juror bias, an appellate court must recognize that it is for the trial court to 'weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings,' and the reviewing court *must* 'defer to factual determinations based on these assessments.'" (*Ibid.*, italics added.) Accordingly, the assessment of equivocal or conflicting statements by a juror is usually left to the trial court. (See *People v. Lynch* (2010) 50 Cal.4th 693, 738–745, abrogated on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 636–643 [affirming dismissal of juror due to equivocal statements and conduct].)

For example, a juror's professed willingness to serve impartially can be overcome by behavior and demeanor noted by the trial court. (See *People v. Zamudio* (2008) 43 Cal.4th 327, 349; *People v. Lucas* (1995) 12 Cal.4th 415, 489.) Such intangibles are to be accounted in favor of the court's decision: "The trial court was in the best position to assess the juror's state of mind, . . . her demeanor, her vocal inflection and other nonverbal cues. 'Even when "[t]he precise wording of the question asked of [the juror] and the answer [she] gave do not by themselves compel [exclusion] . . . ," the need to defer to the trial court remains because so much may turn on . . . demeanor.'"" (*People v. Wilson* (2008) 44 Cal.4th 758, 780; see *People v. Scott* (2015) 61 Cal.4th 363, 340–341.)

---

[4] This deference to the trial court's assessment of a seated but potentially compromised juror is akin to the standard of review for claims regarding prospective jurors. "[T]he reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the 'definite impression' that [s]he is biased, despite a failure to express clear views." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007.) "'[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) gleans valuable information that simply does not appear on the record.'" (*People v. Jones* (2012) 54 Cal.4th 1, 41; *People v. Riggs* (2008) 44 Cal.4th 248, 282.) The United States Supreme Court has expressed a similar perspective: "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.)

Not surprisingly, "while many courts have considered the matter, few have disturbed a trial court's decision to discharge a juror for good cause." (*People v. Bell* (1998) 61 Cal.App.4th 282, 287.)

B.      *THE TRIAL COURT'S DECISION TO EXCUSE JUROR NO. 7 WAS ROOTED IN A DEMONSTRABLE REALITY*

Here, Bryant relies on Juror No. 7's responses to the postnote questioning by the court, in which Juror No. 7 expressed the belief that he could render a fair verdict despite his written note expressing the exact opposite, a note that he gave to the court just one day after being seated as a juror in this case. Bryant's argument is unpersuasive.

Substantial evidence in favor of the trial court's decision exists in Juror No. 7's doubts about his ability to render a fair verdict and his desire to be excused from the jury—doubts which he thought about overnight and became so convinced of their validity that he committed them to paper and delivered the note to the court. Moreover, the trial court had the opportunity not only to listen to Juror No. 7's answers and demeanor during voir dire, but also to question and observe him closely following the receipt of his note. It is clear from the record that far from reassuring the court, Juror No. 7's responses raised only more questions in the trial court's mind about Juror No. 7's ability to perform his duty. To the extent there was a conflict between the responses given by Juror No. 7 prior to and after being seated, it was for the trial court to determine the juror's true state of mind.

Accordingly, based on this record, we conclude the trial court reasonably found that, as a demonstrable reality, Juror No. 7 was unable to perform his duty. Thus, we reject Bryant's contention that the trial court abused its discretion in dismissing Juror No. 7.

## II.     The trial court committed prejudicial error when it excluded evidence of Williams's prior felony convictions

The parties agree that the trial court erred when it precluded Bryant from introducing evidence of Williams's prior felony convictions. The only meaningful

11

dispute between the parties is whether the error implicated Bryant's federal constitutional rights and was harmless.

As discussed below, we agree with both parties that it was an error for the trial court to preclude Bryant's impeachment of Williams via her prior felony convictions. However, while we disagree with Bryant as to whether the error violated the Confrontation Clause of the United States Constitution (it did not), we agree with him that error was not harmless. Accordingly, because the error was prejudicial, we reverse the judgment.

A.       *THE PRECLUSION OF WILLIAMS'S PRIOR FELONY CONVICTIONS WAS AN ERROR*

A criminal defendant has federal and state constitutional rights to confront witnesses against him or her. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) In California, a defendant's right to impeach the credibility of a witness with evidence of the witness's prior convictions is found in the state constitution. Article I, section 28, subdivision (f), of the California Constitution, in pertinent part, provides as follows: "Any prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used without limitation for purposes of impeachment . . . in any criminal proceeding." (See *People v. Jacobs* (2000) 78 Cal.App.4th 1444, 1452.)

Even if this right were not enshrined in the state constitution, California courts have held that when two different provisions of the Evidence Code (§§1202[5] & 788[6]) are considered together, they authorize a defendant (or any other party) to attack the

---

[5] Evidence Code section 1202, in pertinent part, provides as follows: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct. Any other evidence offered to attack or support the credibility of the declarant is admissible if it would have been admissible had the declarant been a witness at the hearing. . . ."

[6] Evidence Code section 788, in pertinent part, provides as follows: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony . . . ."

credibility of a hearsay declarant with the declarant's prior felony convictions, provided those convictions show "moral turpitude." (See, e.g., *People v. Jacobs*, *supra*, 78 Cal.App.4th at pp. 1446, 1449; *People v. Little* (2012) 206 Cal.App.4th 1364, 1375–1376; *People v. Castro* (1985) 38 Cal.3d 301, 313–317.)

Here, the People offered into evidence Williams's hearsay statements to the 911 operator and to one of the responding police officers. Accordingly, Bryant was entitled under Evidence Code sections 1201 and 788, and under article 1, section 28, subdivision (f), of the California Constitution, to impeach her credibility with evidence of her prior felony convictions involving moral turpitude. As a result, the trial court's refusal to allow Bryant to do so was an error.

### B. THE ERROR DID NOT VIOLATE THE CONFRONTATION CLAUSE

The United States Supreme Court has held that "a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.) However, as our Supreme Court has held that "the confrontation clause is concerned *solely* with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, italics added.)

Here, because the hearsay statements at issue were Williams's reports to the 911 operator and to the responding police officers, they were nontestimonial in nature—that is, they were "'made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" (*People v. Cage*, *supra*, 40 Cal.4th at p. 982; see *People v. Brenn* (2007) 152 Cal.App.4th 166, 176–177 [statements to 911 operator & responding police nontestimonial]; *People v. Banos* (2009) 178 Cal.App.4th 483, 492–493, 499 [statements to 911 operator nontestimonial]; *People v. Byron* (2009) 170 Cal.App.4th

13

657, 661–662, 675 [same]; see generally *Davis v. Washington* (2006) 547 U.S. 813, 822, 827; *Crawford v. Washington* (2004) 541 U.S. 36, 59, 68.)

Because the trial court's error did not implicate the Confrontation Clause, it is not subject to the harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24—that is, the harmless "beyond a reasonable doubt" standard. Instead, it is subject to analysis under *People v. Watson* (1956) 46 Cal.2d 818, 836—that is, a defendant must demonstrate that "it is reasonably probable that a result more favorable to [the defendant] would have been reached in the absence of the error." (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611–612 [applying *Watson* standard to erroneous exclusion of defense evidence].) A "'reasonable probability'" does not mean more likely than not, but "merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In other words, a "'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Bolin* (1998) 18 Cal.4th 297, 333.)

C. *THE EXCLUSION OF WILLIAMS'S PRIOR FELONY CONVICTIONS WAS NOT HARMLESS*

After considering all of the evidence, we hold that it is reasonably probable that Bryant would have achieved a more favorable result if the trial court had allowed him to introduce evidence of Williams's prior felony convictions. Our decision is based on the following factors.

First, Williams was not merely one of many prosecution witness; she was the People's single most important witness. The jury, however, never got a chance to see and evaluate her credibility, never had the opportunity to assess her demeanor and the veracity of her varying descriptions of the events at issue, because Williams never testified at trial.

Second, while there was other evidence contradicting Williams's hearsay statements on material points, namely her own testimony at the preliminary hearing, the jury could have received a significantly different impression of Williams's credibility had

14

Bryant been permitted to pursue his proposed line of impeachment. As it was, the jury had to evaluate the credibility of Williams's hearsay statements in a historical vacuum.

Third, because Williams did not testify at trial, no live, in court cross-examination was possible; as a result, the only cross-examination that could occur was through impeachment via the introduction of other evidence, such as the preliminary hearing transcript. Under such constrained circumstances, it would have been appropriate to allow as much impeachment evidence as was both practical and appropriate. Critically, other than its mistaken belief about the admissibility of the convictions, the trial court never stated (and the record does not suggest) that evidence of Williams's prior felony convictions would have been inadmissible under Evidence Code section 352—that is, there is no indication that the probative value of Williams's prior felony convictions would have been "substantially outweighed by the probability that [their] admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Given that the issue of prior felony convictions was limited to just one witness, there was no danger of the trial "degenerating into [a] nitpicking war[] of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296.)

Finally, the People's case against Bryant, while strong, was not "overwhelming." There were no third party eyewitnesses to the altercation between Bryant and Williams; there was only their contending (and, in the case of Williams, changing) versions of events. The People attempted to make up for the lack of other eyewitnesses by introducing, inter alia, evidence of Bryant's history of domestic violence. Even though the People were able to put Bryant's alleged conduct in a larger historical context, and Bryant was not able to do the same for Williams due to the exclusion of the prior felony convictions, the jury did not return an especially quick verdict. The jury began its deliberations at 10:47 a.m. on Friday, February 27, 2015. The jury deliberated through the end of the day without reaching a verdict. The jury resumed its deliberations on Monday, March 2. The jury did not reach its verdict until just a few minutes before noon on March 2. The fact that the jury was forced to deliberate for approximately eight hours

15

over the course of two days suggests that the verdict was anything but a foregone conclusion, making the exclusion of the prior felony convictions potentially quite significant.

This case was, in large part, a he said, she said controversy, making the credibility of the accused and his accuser of central, if not critical, importance to the jury. Because Williams did not testify in person, because the jury heard Williams's voice only on the 911 tape—her testimony at the preliminary hearing was read to the jurors—and because the jury apparently did not consider the case to be an open and shut, slam dunk, it is reasonably probable that Bryant would have achieved a more favorable result if the trial court had allowed him to introduce evidence of Williams's prior felony convictions for crimes of moral turpitude. Accordingly, we hold that the trial court's error was not harmless.

## DISPOSITION

The judgment is reversed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J


16